UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CHRISTINA B.,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        No. 1:20-cv-01936-DLP-JRS
                                       )
KILOLO KIJAKAZI,                       )
                                       )
                    Defendant.         )

### ORDER

Plaintiff Christina B. requests judicial review of the denial by the

Commissioner of the Social Security Administration ("Commissioner") of her

application for Social Security Disability Insurance Benefits ("DIB") under Title II

and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

*See* 42 U.S.C. §§ 423(d). For the reasons set forth below, the Court hereby

**REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this

matter for further consideration.

## I.    PROCEDURAL HISTORY

On January 6, 2017, Christina filed an application for Title II DIB and Title

XVI SSI. (Dkt. 13-2 at 59-60, R. 59-60). Christina's application alleged disability

resulting from severe migraines that affected her vision and speech and caused

numbness throughout her body. (Dkt. 13-2 at 172, R. 172). The Social Security

Administration ("SSA") denied Christina's claim initially on May 10, 2017, (Dkt 13-2

at 59-60, R. 59-60), and on reconsideration on July 12, 2017. (Id. at 79-80, R. 79-80).

On August 7, 2017, Christina filed a written request for a hearing, which was granted. (Dkt. 13-2 at 98, R. 98). On May 10, 2019, Administrative Law Judge ("ALJ") Monica LaPolt conducted a hearing, where Christina appeared in person and vocational expert, Constance Brown, appeared telephonically. (Dkt. 13-2 at 28, R. 28). On July 16, 2019, ALJ LaPolt issued an unfavorable decision finding that Christina was not disabled. (Dkt. 13-2 at 15-20, R. 15-20). Christina appealed the ALJ's decision, and, on May 22, 2020, the Appeals Council denied Christina's request for review, making the ALJ's decision final. (Dkt. 13-2 at 1-3, R. 1-3). Christina now seeks judicial review of the ALJ's decision denying benefits. *See* 42 U.S.C. § 1383(c)(3).

## II.  STANDARD OF REVIEW

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she previously engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these statutory

standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a)[1]. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves her unable to perform her past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1520. (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at step four to

---

[1] Because the statutory references for SSI and DIB claims are substantially similar, the Undersigned will reference them interchangeably throughout this opinion.

determine whether the claimant can perform her own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(iv).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant—in light of her age, education, job experience, and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020); *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Christina is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995). An ALJ's decision "will be upheld if supported by substantial evidence." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019).

In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether the claimant is disabled. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to her conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.   BACKGROUND

#### A. Factual Background

Christina was twenty-four years old as of her alleged onset date of March 3, 2015. (Dkt. 13-2 at 32, R. 32). She completed the 11th grade. (Id.). She has no past relevant work history. (Id. at 42, R. 42).

#### B. ALJ Decision

In determining whether Christina qualified for benefits under the Act, the ALJ

employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and concluded that Christina was not disabled. (Dkt. 13-2 at 20, R. 20). At Step One, the ALJ found that Christina had not engaged in substantial gainful activity since her alleged onset date of March 3, 2015. (Id. at 17, R. 17).

At Step Two, the ALJ found that Christina has one medically determinable impairment: migraine headaches. (Dkt. 13-2 at 17, R. 17). The ALJ concluded that Christina's migraines did not significantly limit "her ability to perform basic work activities. (Id. at 17-20, R. 17-20). Thus, the ALJ found that Christina did not have a severe impairment, and was not disabled. (Id.).

## IV.  ANALYSIS

The Plaintiff argues that the ALJ failed to build a logical bridge between the evidence and her conclusion that Christina's migraine headaches did not constitute a severe impairment. (Dkt. 19 at 8-14). To support this contention, the Plaintiff maintains that the ALJ conducted a flawed credibility analysis. (Id. at 11-13). Additionally, the Plaintiff contends that the ALJ should have subjected the medical records from 2017 onward to medical scrutiny, since those records demonstrated that Christina's migraines were worsening and required more intensive treatment, both of which establish that her migraines were a severe impairment. (Id. at 13-14). The Commissioner maintains that the ALJ's decision to deem Christina's migraine headaches nonsevere was supported by substantial evidence and that the ALJ was not required to submit the additional medical records to medical scrutiny. (Dkt. 20 at 8-17).

At Step Two of the sequential process, the ALJ determines whether the claimant has a "severe medically determinable physical or mental impairment" that has lasted or is expected to last for a continuous period of at least 12 months. 20 C.F.R. § 416.920(a)(4)(ii). To establish a medically determinable impairment, the claimant must show that the condition results "from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.921. Once a claimant has established a medically determinable impairment, the ALJ determines whether the impairment qualifies as severe. *Id.* An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities[2]. 20 C.F.R. § 416.920(a). Impairments are found to be "not severe" when the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered. Social Security Ruling 85-28 (S.S.A. 1985). If no severe impairment exists, the claimant is found not disabled. 20 C.F.R. § 416.920(c).

Social Security Ruling 19-4p addresses how ALJs handle primary headache disorders. SSR 19-4p indicates that migraines are vascular headaches involving throbbing and pulsating pain caused by the activation of nerve fibers that reside

---

[2] Basic work activities are the abilities and aptitudes necessary to do most jobs, which include: physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. SSR 85-28.

within the wall of brain blood vessels traveling within the meninges (the three membranes covering the brain and spinal cord). *Id.* Christina has a diagnosis of a migraine with aura, which according to SSR 19-4p is diagnosed by meeting the following criteria: One of more of the following fully reversible aura symptoms (visual, sensory, speech or language, motor, brainstem, or retinal) and at least three of the following six characteristics (at least one aura symptom spreads gradually over at least 5 minutes; two or more aura symptoms occur in succession; each individual aura symptoms last 5 to 60 minutes; at least one aura symptom is unilateral; at least one aura symptom is positive; or the aura is accompanied or followed within 60 minutes by headache).

When evaluating the severity of primary headache disorders, ALJs consider "a detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations)." *Id.*

### A. Subjective Symptom Analysis

In this case, the ALJ classified Christina's migraine headaches as a medically determinable impairment at Step Two, but concluded that they were not a severe impairment. To reach this conclusion, the ALJ evaluated Christina's subjective symptoms pursuant to 20 C.F.R. § 404.1529 and 416.929 and SSR 16-3p. (Dkt. 13-2 at 18, R. 18). "In evaluating a claimant's credibility, the ALJ must comply with SSR 16-3p and articulate the reasons for the credibility determination." *Karen A. R. v. Saul*, No. 1:18-cv-2024-DLP-SEB, 2019 WL 3369283, at *5 (S.D. Ind. July 26, 2019). SSR 16-3p describes a two-step process for evaluating a claimant's subjective symptoms.[3] First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). Second, the ALJ must evaluate the intensity and persistence of a claimant's symptoms, such as pain, and determine the extent to which they limit his ability to perform work-related activities. *Id.* at *3-4.

A court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510 (internal quotation marks and citation omitted). To satisfy this standard, the ALJ must justify her subjective symptom evaluation with "specific reasons supported by the record,"

---

[3] SSR 16-3p became effective on March 28, 2016, (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *13, replacing SSR 96-7p, and requires an ALJ to assess a claimant's subjective symptoms rather than assessing his "credibility." By eliminating the term "credibility," the SSA makes clear that the "subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2016 WL 1119029 at *1. The Seventh Circuit has explained that the "change in wording is meant to clarify that administrative law judges are not in the business of impeaching a claimant's character." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

*Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and build an "accurate and logical bridge between the evidence and conclusion." *Villano,* 556 F.3d at 562. An ALJ's evaluation is "patently wrong" and subject to remand when the ALJ's finding lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008); *Cassandra S. v. Berryhill*, No. 18-00328, 2019 WL 1055097, at *5 (S.D. Ind. Mar. 6, 2019).

At step two of the Rule 16-3 analysis, the ALJ considers the claimant's subjective symptom allegations in light of the claimant's daily activities; the location, duration, frequency, and intensity of pain and limiting effects of other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain. 20 C.F.R. § 404.1529(c)(3).  Although the Court will defer to an ALJ's subjective symptom finding that is not patently wrong, the ALJ must still adequately explain her subjective symptom evaluation "by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367. Without this discussion, the Court is unable to determine whether the ALJ reached her decision in a rational manner, logically based on her specific findings and the evidence in the record. *Murphy*, 759 F.3d at 816 (internal quotations omitted); *see also* SSR 16-3p, at *9.

When assessing a claimant's subjective symptoms, ALJs are directed to "consider the consistency of the individuals own statements. To do so, [they] will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other

circumstances." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *8. The ruling also explains that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." *Id*. at *9.

After considering Christina's statements regarding her migraine headaches, the ALJ concluded that Christina's statements were not entirely consistent with the record. (Id. at 19, R. 19). The ALJ's discussion is as follows:

> The evidence of record shows the claimant's headaches reportedly increased around her alleged onset date; however, her symptoms would resolve with abortive treatment. The claimant alleged that she experiences dizziness, whole body numbness, and blurred vision with migraine onset; however, she is consistently negative for neurological deficits on examination (Ex. 2F at 1, 5; 3F at 1, 86).
>
> In April 2015, the claimant met with a neurologist for alleged chronic headaches. On examination, the claimant insisted that she was unable to tolerate prescription medication without experiencing side effects; however, she admitted that she had inadequate fluid hydration (Ex. 2F at 1). Notably, her physical examination was within normal limits. Moreover, an optic examination performed in June 2016 revealed the claimant's corrected visual acuity was 20/20 bilaterally (Ex. 1F at 3). Seemingly, the claimant presented with scattered visual field defects in both eyes; however, the examining optometrist found the test unreliable due to excessive false negatives (Ex. 1F at 5).
>
> The evidence of record shows the claimant has sought emergency medical attention multiple times for acute migraine headache. Specifically, the claimant presented to the emergency room three times in 2015, four times in 2016, and twice in 2017 for treatment of acute migraine. During each encounter, the claimant reported associated facial numbness and visual disturbance; however, her clinical presentation was grossly non-focal. Moreover, her head CTs,

brain MRIs, and EEGs were all within normal limits (Ex. 3F at 4, 7, 13, 15, 19, 32, 36, 38-40, 54, 58, 64, 99). Interestingly, the claimant revealed that she was abusing illegal drugs on a daily basis (Ex. 3F at 13, 62, and 78). Thus, it is unclear whether her use of drugs exacerbated migraines and associated symptoms.

The claimant was prescribed treatment prophylaxis, but the evidence shows she was marginally compliant (Ex. 2F at 6; 3F at 100; 4F at 4). Furthermore, the claimant was not wearing her corrective lenses as prescribed, which admittedly reduced the frequency of headaches (Ex. 7F at 19).

During a neurological examination in January 2017, the claimant reported that the intensity and frequency of headaches was less with the use of Fioricet medication. The claimant complained that she continued to have breakthrough symptoms two times per week, but she maintained inadequate fluid hydration. Further, she was not engaging in regular exercise as recommended (Ex. 2F at 11).

On examination in March 2018, the claimant indicated that she was experiencing headaches almost daily and migraines two to three times per month; however, she was overusing Ibuprofen medication. In any event, she was negative for focal clinical deficits and she asserted that Topamax medication remained overall effective (Ex. 7F at 15).

Recent evidence shows the claimant's treatment plan was adjusted to include monthly preventative injections. The evidence shows the claimant's migraines have improved significantly with prescribed treatment (Ex. 7F at 6-8, 12-13). She reported breakthrough headaches about two times per week, but she denied further visits to the emergency room for intractable symptoms. Moreover, she has maintained a normal clinical presentation on follow up examinations.

The claimant alleged that her headaches interfered significantly with daily functioning, but the record is devoid of related complaints. Furthermore, the claimant requested discharge from the hospital on one occasion to tend to her family. Overall, the conclusion that the claimant does not have an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities is consistent with the objective medical evidence and other evidence.

(Dkt. 13-2 at 19-20, R. 19-20). The Court can glean six reasons the ALJ gave to support her finding of inconsistency: (1) improvement with treatment; (2) lack of neurological deficits on examination and objective medical testing shows normal findings; (3) unreliable visual field testing; (4) marginal compliance with treatment recommendations; (5) daily activities not consistent with claimed symptoms; and (6) drug use. (Id. at 19-20). The Court will address each reason in turn.

### i.  *Improvement with Treatment*

The ALJ notes that the evidence of record shows the claimant's headaches increased, but "that her symptoms would resolve with abortive treatment." (Dkt. 13-2 at 19, R. 19). The ALJ also cites the success of various treatments in helping Christina control her migraines or improve the symptoms. (Dkt. 13-2 at 18-20, R. 18-20). The ALJ, however, leaves out important context for these improvements. It is true that Christina reported various medications had improved her symptoms, but she also had to stop taking each of those medications due to increasing side effects or waning effectiveness.

While Topamax was successful for several years, as the ALJ noted, Christina had to stop taking the medication in 2018 because it began to cause neurological symptoms and cognitive impairment. (Dkt. 13-3 at 158, R. 390). At that point, Dr. Bales began intramuscular injections of Aimovig once per month starting in December 2018. (Id. at 149-158, R. 381-90). At the time of the hearing in May 2019, Christina testified, and Dr. Bales's treatment notes confirmed, Dr. Bales was considering increasing Christina's dosage to twice per month to see if that would help

13

reduce her continuing migraines. (Dkt. 13-2 at 39, R. 39; Dkt. 13-3 at 153, R. 385). And, while Christina did report that Fioricet helped with the intensity and frequency of her headaches, she testified at the hearing that she had to take it approximately 15-16 times per month and it was only effective 9-10 of those times, meaning that she was having breakthrough headaches despite the Aimovig injections at least 15-16 times per month and that the Fioricet only helped alleviate the symptoms for 9-10 of those breakthrough headaches. (Dkt. 13-2 at 36-37, R. 36-37). Even with the Aimovig, Christina still reported breakthrough headaches at least 2-3 times per week, for a total of 8-12 times per month.

The ALJ does not confront the evidence contradictory to her conclusion and fails to acknowledge that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *9.

No doctor opined that Christina's recounting of the effectiveness of her treatments was incorrect or exaggerated; instead, they continued to treat her, increase her medication dosage, and switch medications according to her reports; perhaps more importantly, no doctor deemed Christina's migraines well-controlled by her treatment regimen. Even after trying all of these medications, Christina reported that she still experienced migraines but that the symptoms were lessened, and that

she still had headaches of the same intensity at least 2-3 times per week. (Dkt. 13-3 at 151, R. 383).

Christina reported to Dr. Bales and testified at the hearing that these headaches cause a pressure sensation on the back of her head that is aggravated by bright light, and associated with blurring of vision, neck pain, vision and speech loss, body tingling, shaking, and numbness, and could last hours or up to a whole day. (Dkt. 13-2 at 38, R. 3; Dkt. 13-3 at 161, R. 393). Dr. Bales confirmed that these headaches were likely to produce stroke-like symptoms. (Dkt. 13-3 at 158, R. 390).

Perhaps more importantly, even though Christina had normal medical imaging, no doctor opined that the normal medical imaging was inconsistent with Christina's complaints, *see Moon*, 763 F.3d at 722 (ALJ's conclusion unsupported where no doctor even suggested that normal imaging was inconsistent with severe migraines); instead, they proceeded to treat her migraine symptoms as alleged, and the extent her care providers went to try to alleviate her headaches suggests that they believed her symptoms were severe and frequent, despite normal presentation and medical imaging. *See Nowak v. Saul*, No. 20-CV-1088-SCD, 2021 WL 1263753, at *9 (E.D. Wis. Apr. 6, 2021) (providing numerous prescriptions and increasing prescriptions indicates physician belief in symptom complaints). All of this testimony ignored or glossed over by the ALJ is important because of the vocational expert's testimony that an individual may not miss more than one day of work per month or be off-task more than 10% of the day. (Dkt. 13-2 at 43, R. 43).

15

ii.    *Lack of Neurological Deficits on Examination*

Next, the ALJ indicated that the claimant's migraine symptoms of dizziness, whole body numbness, and blurred vision with migraine onset were not supported by objective medical evidence or neurological examinations. (Dkt. 13-2 at 19). Throughout the opinion, the ALJ repeatedly mentions Christina's normal clinical presentation and lack of neurological deficits. (Dkt. 13-2 at 19-20, R. 19-20). First, as noted previously, each of Christina's doctors accepted her reported migraine symptoms of dizziness, whole body numbness, and blurred vision, and treated her migraines accordingly. Second, even if Christina had none of those symptoms during her medical examinations, that may only suggest that she did not have a migraine at that time, rather than saying anything about the frequency and severity of her migraine symptoms. *See Moon*, 763 F.3d at 721 (the fact that the claimant had no headache on examination said nothing about the frequency and severity of her migraines).

And finally, no medical source opined that normal clinical and neurological presentation is inconsistent with complaints of severe migraine symptoms. *See Wessel v. Colvin*, No. 4:14-cv-00055-SEB-DML, 2015 WL 5036775, at *6 (S.D. Ind. Aug. 4, 2015) (ALJ's conclusion unsupported where no doctor suggested normal imaging or normal physical presentation was inconsistent with severe migraine symptoms); *Chavez v. Colvin*, No. 1:14-cv-192, 2015 WL 1733767, at *11 (N.D. Ind. Apr. 15, 2015) (same); *Suhsen v. Saul*, No. 20-CV-519-JDP, 2021 WL 1921434, at *5 (W.D. Wis. May 13, 2021) (same). The ALJ's reliance on objective medical imaging and neurological

testing is misplaced in this case, largely because her own treating physicians accepted her symptom allegations and treated her for those same symptoms. Thus, the ALJ's conclusion regarding the importance of normal objective medical evidence is not supported by the record.

       *iii.*   *Compliance with Treatment Recommendations*

The ALJ next concludes that Christina was marginally compliant with her prescribed prophylactic treatment, citing to five different records. (Dkt. 13-2 at 19, R. 19). A review of the evidence confirms that the ALJ mischaracterized all five records. The first and fifth references are to an April 9, 2015 visit to neurologist Dr. Mehyar Mehrizi who recommended that Christina avoid the overuse of over-the-counter pain medications and explained the importance of migraine hygiene *including* good fluid hydration, routine exercise, obtaining good sleep, and healthy eating. (Dkt. 13-2 at 19, R. 19 (citing Dkt. 13-3 at 16, R. 248)). At the follow-up visit with Dr. Mehrizi in January 2017, Christina admitted to not drinking enough water, not eating well, and not exercising regularly, and Dr. Mehrizi gave Christina the exact same advice regarding migraine hygiene. (Dkt. 13-3 at 17, 22, R. 249, 254). The ALJ indicates that a cause of Christina's breakthrough headaches is her inability to maintain good migraine hygiene, which included a lack of hydration and no regular exercise. (Dkt. 13-2 at 19, R. 19).

Nowhere in the record does Dr. Mehrizi suggest that a failure to fully comply with migraine hygiene is a *cause* of Christina's migraines – in fact, Dr. Bales noted in 2018 that Christina should continue to work on diet and exercise for general health

only. (Dkt. 13-3 at 162, R. 394). Moreover, the Court notes that the Commissioner's own Rulings indicate that lifestyle modifications, such as dieting, exercise, or smoking cessation are not considered prescribed treatment, and that a failure to follow recommendations does not amount to a failure to follow prescribed treatment. *Lashaun B. v. Saul*, No. 2:19-cv-38, 2019 WL 6112561, at \*14 (N.D. Ind. Nov. 18, 2019) (citing SSR 18-3p)).

The ALJ also discredits Christina's symptoms because of her over-use of Ibuprofen. (Dkt. 13-2 at 19, R. 19 (citing Ex. 7F at 15, Dkt. 13-3 at 162, R. 394). During her March 2018 initial visit, Dr. Bales noted that Christina's persistent daily headache was likely the result of Ibuprofen overuse. (Dkt. 13-3 at 162, R. 394). At her follow-up visit in June 2018, Christina reported that she was using Ibuprofen a lot less, but Dr. Bales' notes indicated that it was the introduction of the Topamax medication that had lessened Christina's headaches. (Dkts. 13-3 at 159-60, R. 391-92). Perhaps most importantly, Christina continued to have persistent headaches, even after decreasing her Ibuprofen use, a complaint that her doctors accepted. (Dkt. 13-3 at 151, 158, 161, R. 383, 390, 393). And finally, even if the Court were to accept the ALJ's contention that Christina's subjective symptoms were not as severe as alleged because she sometimes caused them due to her Ibuprofen use, the ALJ did not address Christina's repeated testimony throughout the record that numerous other factors, all outside of her control, caused her to experience headaches and migraines, including sunlight, stress, fluorescent lights, watching television, reading,

and sometimes for no reason at all. (Dkt. 13-2 at 37-40, 179, R. 37-40, 179; Dkt. 13-3 at 12, 17, 159, R. 244, 249, 391).

The second reference is to an ER visit in February 2017 when Christina refused to receive intravenous fluids and medication. (Dkt. 13-2 at 19, R. 19 (citing Ex. 3F at 100)). The ALJ leaves out the context of this refusal, where Christina instead requested to receive the medications intramuscularly, a request which was approved by her medical providers. (Dkt. 13-3 at 123-24, R. 355-56).

The third reference is to a follow-up visit to her primary care physician's office on September 22, 2016 that advises her to quit smoking – however, there is no indication in any medical record that smoking is a potential cause or aggravator of Christina's migraines. (Dkt. 13-2 at 19, R. 19 (citing Ex. 4F at 4; Dkt. 13-3 at 131, R. 363)). Moreover, as stated previously, smoking cessation is a recommendation and not a prescribed treatment.

The fourth reference is to a medical visit where the ALJ found that Christina allegedly admitted that wearing her corrective lenses "reduced the frequency of her headaches." (Dkt. 13-2 at 19, R. 19 (citing Ex. 7F at 19; Dkt. 13-3 at 166, R. 398)). When viewing the record, the Court finds that Christina did not state that wearing her glasses reduced the frequency of her migraines; rather, she noted that when wearing her glasses her migraine symptoms were lessened. (Dkt. 13-3 at 166, R. 398). Thus, Christina's glasses use was not a prophylactic treatment.

The ALJ also does not confront the evidence that contradicts her conclusion, namely Christina's history of treatment compliance with respect to various

medications such as Amitriptyline, Cyclobenzaprine, Verapamil, Zanaflex, Riboflavin, and Magnesium. (Dkt. 13-3 at 162, 166 R. 394, 398). As it stands, the ALJ's proffered reasons to support a conclusion that Christina was marginally compliant with her treatment recommendations were inaccurate, and not supported by the evidence.

       *iv.*   *Visual Field Testing*

The ALJ notes that Christina had visual field testing performed in June 2016 that showed scattered visual field defects, but that the test was found unreliable due to excessive false negatives. (Dkt. 13-2 at 19, R. 19). The ALJ does not mention, however, that Christina had another field test done in March 2018 by the same provider, where the results of multiple field defects were still deemed unreliable but were "relatively repeatable to [the] previous" exam. (Dkt. 13-3 at 170, R. 402). The optometrist concluded that the results have a neurologic pattern consistent with previous tests, and diagnosed Christina with unspecified visual field defects. (Id. at 170-71, R. 402-03). If the results of a third visual field test were similar, the optometrist determined that Christina would be referred for a repeat MRI of the head to locate any potential causes of her visual field defects. (Id.). The ALJ, although listing some of this information in her explanation of discounting Christina's credibility, never explains how this testing contradicts Christina's claims of vision difficulties. Moreover, the optometrist never suggests that the eye exam results contradict Christina's claims of migraine symptoms, including vision limitations.

v.  *Activities of Daily Living*

The ALJ next indicates that Christina alleges her migraines interfere with her "daily functioning, to the extent she was unable to engage with her children." (Dkt. 13-2 at 18, R.18). The ALJ concludes that Christina's migraines do not interfere with her daily functioning because the record is "devoid of related complaints," and Christina once requested discharge from the hospital to tend to her family. (Dkt. 13-2 at 20, R. 20). When questioned at the hearing, Christina testified that she can only do the dishes, vacuuming, laundry, and take out the trash; she cannot do the cooking because she gets dizzy standing at the stove; she goes outside the house when it is gloomy because sunlight bothers her eyes and causes headaches to begin; and watching television and reading also cause headaches. (Dkt. 13-2 at 37-39, R. 37-39). She also testified that she attempted to take her kids to the Children's Museum, but that the bright lights triggered a headache spell and forced her to go sit in the car and wait for her family to finish their outing. (Dkt. 13-2 at 40, R. 40).

Christina's headache questionnaire filled out on March 27, 2017 confirmed the same information: she had daily headaches with pain on the back of her head, blurred vision, body numbness, difficulty speaking and concentration, and sometimes loss of memory. (Dkt. 13-2 at 179, R. 179). Christina indicated that these episodes could last up to an entire day. (Id.). She further noted that headaches appear at random sometimes, so she could be playing with her children and suddenly need to go lie down because of the pain, and that even when she does not have a headache she is wary of doing much activity because she is scared that a headache will begin. (Id.).

Her descriptions to Dr. Mehrizi and Dr. Bales were similar, that her migraines were aggravated by bright light and were associated with blurring of vision, neck pain, and pain on the back of her head. (Dkt. 13-3 at 12, 159, R. 244, 391). Thus, the ALJ's contention that the record is devoid of complaints related to daily functioning is incorrect. Christina repeatedly notes how her headaches interfere with her daily activities and her complaints remain consistent throughout the record.

The ALJ also makes one comment that Christina requested discharge from the hospital to tend to her family. (Dkt. 13-2 at 20, R. 20). The ALJ once again leaves out the context for this visit. Christina had indicated her headache had resolved when she requested to be discharged. (Dkt. 13-3 at 70, R. 302). Furthermore, a need to take care of one's children does not suggest that that individual is exaggerating claimed symptoms or capable of sustaining full-time work.

### vi.   *Drug Use*

Finally, the ALJ makes the following statement related to one of Christina's ER visits: "[i]nterestingly, the claimant revealed that she was abusing illegal drugs on a daily basis. Thus, it is unclear whether her use of drugs exacerbated migraines and associated symptoms." (Dkt. 13-2 at 19, R. 19 (internal citations omitted). The Court notes that the ALJ cited to two ER visits from 2015 and January 2016 that reference heroin use; the third cited record is to lab work that appears to show Christina testing positive for barbiturates. First, Christina is prescribed a barbiturate, Fioricet, so it would be reasonable for her to test positive for having that type of drug in her body. Second, while it is not error to consider Christina's drug use,

ALJs must tread carefully when associating drug use and claimed symptoms, especially when chronic migraines are not inconsistent with drug use. *Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014). The Court notes that no physician in the record, from primary care to ER to neurology, indicated that Christina's drug use was a contributing factor to the frequency or intensity of her migraines – instead, it appears that the ALJ inserted her own opinions as to the effect of Christina's drug use. As such, this reason is insufficient to justify discounting Christina's subjective symptoms.

In this case, the ALJ's stated reasons for discrediting Christina's subjective symptom allegations are not supported by the record. As such, remand is appropriate in order for the ALJ to conduct a proper analysis of Christina's chronic migraine allegations.

### B.    State Agency Medical Opinions

The Plaintiff also contends that the ALJ erred by finding the opinions of the state agency medical consultants to be persuasive and then explicitly adopting those opinions. (Dkt. 19 at 13). Specifically, Plaintiff maintains it was error to adopt the state agency opinion because they did not review any medical evidence after July 2017, which would include all of the records from neurologist Jamie Bales who established care in March 2018 and started Christina on monthly Aimovig injections, as well as records of abnormal visual field tests. (Id.). This medical evidence, Plaintiff argues, should have been subjected to medical scrutiny because of its potentially decisive effect with regard to the severity of Christina's migraines. (Id. at 13-14).

The ALJ acknowledged the state agency opinion that Christina's migraines were nonsevere and adopted it because "they have program knowledge and they reviewed most of the medical evidence." (Dkt. 13-2 at 20, R. 20). The ALJ is correct that the state agency physicians reviewed *most* of the medical evidence and in *most* cases, that would be sufficient; here, however, Christina has put forward evidence that she now has to receive monthly injections from her neurologist and may need two injections per month, along with taking an abortive medication for breakthrough headaches at least 15 days per month. (Dkt. 13-3 at 149-158, R. 381-90). Furthermore, even with that treatment, her breakthrough headaches can cause light and sound sensitivity, blurry vision, numbness, tingling, and loss of speech. (*Id.*) No medical expert reviewed this evidence, yet the ALJ concluded on her own that Christina's "migraines have improved *significantly* with prescribed treatment." (Dkt. 13-2 at 20, R. 20) (emphasis added).

This evidence is potentially decisive given the vocational expert's testimony that an individual cannot miss more than one day of work per month or be off task more than 10% of the work day. An individual such as Christina who must attend one to two medical appointments per month, and has presented consistent testimony supported by her neurologist that even with all of this treatment she experiences severe headaches at least 2-3 times per week with symptoms of blurry vision, numbness, tingling, loss of speech, and light and sound sensitivity, may be able to demonstrate that her chronic migraines have more than a minimal impact on her

daily functioning and thereby constitute a severe impairment. As such, remand is required on this issue.

## V.   CONCLUSION

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four). Final judgment will issue accordingly.

So ORDERED.

Date: 1/19/2022

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email.